# In the
# United States District Court
## For the
### Western District of Wisconsin

Mikayla Marie LeRette,

      Plaintiff,

    v.                                         Case No. 25-cv-183

The City of Superior, Wisconsin, and,
In Their Individual Capacities,
Thomas Champaigne, John Kiel,
Jeffrey Harriman and Michelle Pope,

      Defendants.

# Second Amended COMPLAINT

## I.    NATURE OF ACTION

101.    This is a civil rights action. One claim arises under 42 U.S.C. Sec. 1983 and the Fourth Amendment to the United States Constitution and seeks relief for the unlawful warrantless placement of an electronic tracking device on Plaintiff's assigned

1

vehicle. A second claim arises under the Fair Labor Standards Act, 29 U.S.C. §§ 201-209 and seeks relief for the unlawful failure of the Defendant City to provide the Plaintiff with an adequate place to express breast milk during the months after the birth of her first child in violation of 29 U.S. Code § 218d.  A third claim arises under 42 U.S.C. Sec. 1983 and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and alleges a wide-ranging campaign of discrimination against the Plaintiff after she took leave for pregnancy and childbirth.

## II.     JURISDICTION AND VENUE

201.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 29 U.S.C. § 216(b) (Fair Labor Standards Act jurisdiction).

202.     The Western District of Wisconsin is the proper venue for this action because the Plaintiff's claims arose within the geographical boundaries of the Western District of Wisconsin within the meaning of 28 U.S.C. § 1391(b).

## III.     PARTIES

### A.     Plaintiff

301.     The Plaintiff, Mikayla Marie LeRette, is a natural person and an adult with the capacity to sue in this Court.

## B.    Defendants

301.    Defendant City of Superior, Wisconsin, is a Wisconsin city with the capacity to sue and be sued in this Court.  Defendant City of Superior is liable for the unlawful acts of the individual Defendants because they were acting within the scope of their employment pursuant to Sec. 895.46, Wis. Stats.  The Plaintiff does not allege that the wrongful acts alleged herein were carried out pursuant to a custom or policy of City of Superior.

301.    Defendant Thomas Champaigne is a former police captain for the City of Superior, Wisconsin. At all times relevant to this lawsuit, Defendant Champaigne was acting under color of law within the meaning of 42 U.S.C. § 1983, and within the scope of his employment as that term is used in § 895.46, Wis. Stats.

302.    Defendant John Kiel is the Assistant Chief of Police of the City of Superior, Wisconsin. At all times relevant to this lawsuit, Defendant Kiel was acting under color of law within the meaning of 42 U.S.C. § 1983, and within the scope of his employment as that term is used in § 895.46, Wis. Stats.

303.    Defendant Jeffrey Harriman is a current police captain for the City of Superior, Wisconsin. At all times relevant to this lawsuit, Defendant Harriman was acting under color of law within the meaning of 42 U.S.C. § 1983, and within the scope of his employment as that term is used in § 895.46, Wis. Stats.

304.    Defendant Michelle Pope is a current police lieutenant for the City of Superior, Wisconsin. At all times relevant to this lawsuit, Defendant Pope was acting

under color of law within the meaning of 42 U.S.C. § 1983, and within the scope of her employment as that term is used in § 895.46, Wis. Stats.

## IV.    ALLEGATIONS OF FACT AS TO ALL CAUSES OF ACTION

4001.   In 2022, Plaintiff Mikayla Marie LeRette had been employed as a police officer for the City of Superior, Wisconsin, for nearly ten years.

4002.   Her experience included assignments as a patrol officer, field training officer, evidence technician, and hostage negotiator. Since January of 2020, she had been serving as a narcotics investigator.

4003.   Since 2020, Plaintiff LeRette has been married to Paul Winterscheidt, who, in the spring of 2022 was Captain of Patrol, and in January of 2024 became Chief of Police.

4004.   As a narcotics investigator, Plaintiff LeRette's immediate supervisor was Lieutenant Michelle Pope, who also supervised another drug investigator, Thomas Custer.

4005.   Until March of 2024, Lieutenant Pope's immediate supervisor was Captain Thomas Champaigne, the Captain of Investigations. He was succeeded in this position by Captain Jeffrey Harriman.

4006.   In 2022, Plaintiff LeRette became the first Superior police officer to become pregnant in more than 20 years. She informed Lieutenant Pope of her pregnancy in March of 2022.

4

4007.   Then-Captain Thomas Champaigne and then-Lieutenant Michelle Pope immediately consulted with the City of Superior Human Resources Department to force Plaintiff LeRette's removal from her narcotics assignment, despite the fact that she had no work restrictions from her physician. They were advised by the Human Resources Department that this was not possible.

4008.   In the spring of 2022, Captain Champaigne, who was then Captain of Investigations, told Captain Winterscheidt, who was then Captain of Patrol, that he did not believe a pregnant police officer should be a narcotics officer, and that it if were up to him, he would remove Plaintiff LeRette from the position.

4009.   Captain Champaigne admitted to Captain Winterscheidt that he had gone to Human Resources in an attempt to remove Plaintiff LeRette from her narcotics investigator assignment due to her pregnancy.

4010.   In the spring of 2022, Assistant Chief of Police John Kiel began making numerous comments about Plaintiff LeRette's pregnancy in front of members of the police department.

4011.   Plaintiff LeRette observed some of these comments taking place in the police department squad room.

4012.   Assistant Chief Kiel told Plaintiff LeRette that she should be required to wear a "matron skirt" and answer "desk calls" as a pregnant police officer, and they were not sure what to do with her.

4013.   Assistant Chief Kiel made numerous comments about requiring Plaintiff LeRette to wear a matron skirt, embarrassing her in the presence of others, and

reiterating the fact she should be removed from her position as a narcotics investigator due to her pregnancy.

4014.   In August, 2022, Plaintiff LeRette went on maternity leave to give birth to her first child.

4015.   In September of 2022, while still on maternity leave, and while discussing the possibility of obtaining a new cell phone with Assistant Chief Kiel, Plaintiff LeRette told him that she would need to be on light duty when she returned to work due to complications from her pregnancy and childbirth.

4016.   In November of 2022, Plaintiff LeRette informed her immediate superior, Lieutenant Michelle Pope, that when she returned to work, she would have a need to express her breast milk during the working day and would need breaks from work and a suitable place to do so.

4017.   Plaintiff LeRette asked Lieutenant Pope for a lactation area that would be sufficient for this purpose.

4018.   There was no area within the police department designated for lactating mothers.

4019.   Because there was no better alternative offered to her by her superiors, Plaintiff LeRette agreed to use put a chair in a shower stall in the women's locker room (which includes toilets, sinks, and showers, and almost no privacy) by Pope.

4020.   Because there was no better alternative offered to her by her superiors, Plaintiff LeRette said she would use place a chair placed by Pope behind a

6

curtain in the shower stall, and use an extension cord to connect the pump to electricity in the shower area.

4021.  Former Union President, Officer Charles Mahlen, and the Plaintiff had numerous discussions about the treatment the Plaintiff was enduring by Lieutenant Pope and Captain Champaigne, along with the lack of accommodations for a nursing mother returning to work.

4022.  Officer Mahlen suggested a meeting with Chief Alexander as Captain Champaigne was Lieutenant Pope's supervisor, and he was also engaging in discriminatory treatment.

4023.  Officer Mahlen, and the Plaintiff thus requested a meeting with Chief Alexander regarding the treatment the Plaintiff had endured at the hands of Lieutenant Pope and Captain Champaigne after returning to work from maternity leave in November of 2022. Chief Alexander agreed to the meeting, which occurred in his office at the Superior Police Department. The Plaintiff believes the date was November 16, 2022.

4024.  At the meeting, Officer Mahlen and the Plaintiff discussed the lack of accommodations for expressing breast milk, along with the treatment the Plaintiff had endured while returning to work on a light duty status.

4025.  The treatment reported to Chief Alexander at that meeting can be summarized as follows:

a.  On approximately November 16, 2022, Union president Officer Mahlen and Investigator LeRette requested a meeting with Chief

Alexander to discuss ongoing harassment from Lieutenant Pope and Captain Champaigne, along with working conditions on light duty status (from pregnancy, delivery and nursing).

b. Negative treatment by Lieutenant Pope from LeRette's first day back to work after maternity leave. Pope yelled at Investigator LeRette in the Records Office for not being "in the property room."

c. Frequent "unexpected check-ins" by Lieutenant Pope during Investigator LeRette's assignment in the property room.

d. Lieutenant Pope questioned Investigator LeRette while she was walking down the hallway to use her breast pump.

e. Lieutenant Pope made a comment about Investigator LeRette's urgency to use the restroom due to having a child and said, in a demeaning tone, something similar to "Oh, that hasn't come back yet?" as if LeRette were exaggerating or not "healing" fast enough.

f. Lieutenant Pope belittled Investigator LeRette for her lifting restriction.

g. Lieutenant Pope told Investigator LeRette she was not allowed to leave the building or drive a City vehicle while on light duty.

h. One day, Lieutenant Pope told Officer Kelsey Davis and Officer Nelson to wear a required uniform in the property room, but did not tell Investigator LeRette of this requirement. The next day, Investigator LeRette was singled out by being sent the uniform

policy by Captain Champaigne, who said she was not adhering to the uniform policy, which had never been applied in the property room before Investigator LeRette was assigned there. Lieutenant Pope intentionally had Captain Champaigne address this "violation" with Investigator LeRette instead of speaking to her informally about the uniform policy along with the other employees.

i.   Lieutenant Pope received a call from the Lake Superior Violent Offender Task Force (LSVOTF) to ask for help with warrants and follow up computer work. Investigator Monte asked if Investigator LeRette could assist with this. Lieutenant Pope told Investigator LeRette that, as long as she was on light duty status, she was only allowed to work on narcotics work from 1630 hours to 1800 hours. Lieutenant Pope told Investigator LeRette that Investigator Monte did not mention more narcotics work to be completed, implying that Investigator LeRette was lying to her about having more obligations in narcotics assignments to "get out of the property room."

j.   Investigator LeRette attempted to ask Lieutenant Pope questions and to be cordial with her while standing in her office. Lieutenant Pope ignored Investigator LeRette. Investigator LeRette then said, "Okay, back to the basement I go," as Pope was refusing to

communicate or acknowledge LeRette; Lieutenant Pope

sarcastically replied "RIGHT ON!"

k.  On or about November 11, 2022, Plaintiff LeRette contacted

Investigator Adam Johnson, who is on the officer fitness committee,

and who had developed the policy permitting members of the

police department to work out on duty to ask if there are any

restrictions to officers on a "light duty" status working out on duty.

Plaintiff LeRette wished to use her on duty work out time to

complete physical therapy in the gym. Investigator Johnson said he

believed there was no exception preventing light duty status

employees from utilizing the work-out-on-duty privilege. Later

that day Investigator LeRette worked out on duty in the gym.

Detective Milroy was walking on the treadmill and possibly

another sheriff's deputy. The next day, Captain Champaigne called

Plaintiff LeRette and told her that she needed to be in the

department gym if she were going to work out on duty. Plaintiff

LeRette told Captain Champaigne she had been working out, and

had been in the gym, and she named the employees who had been

in the gym with her. Captain Champaigne then back-pedaled and

said he didn't even think detectives and investigators were allowed

to work out on duty.

l.   Lieutenant Pope had begun monitoring Investigator LeRette's and

10

Officer Davis's lunch breaks. Lieutenant Pope asked Officer Davis how long she had been "taking a lunch."

m.  Investigator LeRette was using a shower stall in the women's locker room/bathroom for lactation needs. Chief. Alexander was made aware of these conditions and was told that Lieutenant Pope had also been made aware of them but had offered no solutions.

n.  Investigator LeRette told Chief Alexander that she was fearful to make a formal complaint against Lieutenant Pope and Captain Champaigne because she feared retaliation and further harassment, and she just wanted to have a cohesive working environment free from hostility and harassment.

o.  Investigator LeRette told the chief she did not feel it would be beneficial for her to address the matter with Captain Champaigne as she had experienced the same treatment from him and believed he would not address the matter with Lieutenant Pope, who was his good friend.

p.  Chief Alexander directed Investigator LeRette to obtain a doctor's note so he could provide proof to Lieutenant Pope explaining that LeRette should not be required to work in the property room; he agreed she could perform most of her duties as an investigator despite her light duty status.

q.  Investigator LeRette also addressed her concerns about Officer

Davis working in the property room and not following her medical

restrictions imposed due to her broken wrist. Investigator LeRette

felt she needed to stick up for Officer Davis as it was obvious she

was required to work outside of the guidelines of the medical

restrictions she had shared with Lieutenant Pope, Human

Resources, and Investigator LeRette.

4026.    After the Plaintiff complained to Chief Alexander about having no

accommodations and having been being harassed by Lieutenant Pope and Captain

Champaigne, he offered the Public Health Nurse's office somewhere in the Government

Center for Plaintiff LeRette to express breast milk. Chief Alexander sent the Plaintiff an

email which stated the Plaintiff could use the public health nurse's office, which would

require a reservation time to use, and was not always accessible during her work hours.

The Plaintiff chose not to use this facility because the reservation process was

cumbersome, it was not within the police department, the Plaintiff would have had to

haul her equipment around, and the Plaintiff needed the flexibility to be able to time her

pumping around her duties.

4027.    Superior Police Department officials were notified that no

appropriate space for lactation had been provided for Plaintiff LeRette.

4028.    Then Patrol Captain Winterscheidt brought the need for a

"mother's room" to the attention of command staff members including then Chief

Alexander, then Captain Champaigne, and Lieutenant Pope, at two staff meetings, at

least one of which took place after Chief Alexander's offer of the public health nurses'

office, which at least Pope knew that Plaintiff LeRette was not using. He said this problem was going to end up opening the Superior Police Department up to liability because there is no federally-mandated appropriate place for mothers to express breast milk. No action was taken as a result of this notice.

4029.   Jennie Nelson (now Holmquist), one of Plaintiff LeRette's co-workers in her new property room assignment, was on personal good terms with then Chief of Police Alexander. She telephoned him when she and Plaintiff LeRette were in the property room together and told him that he needed to make it a priority to have a mother's room at the Police Department instead of women returning to work with insufficient place to pump. She did this in Plaintiff LeRette's presence while they were both working at the Police Department.

4020.4030.    Nelson's telephone call about the need for an adequate spce for nursing mothers to express breast milk occurred after Chief Alexander's offer of the public health nurses' office.

4021.4031.    No appropriate or legal space was provided for Plaintiff LeRette despite her and others notifying her Chief of Police that the space made available for her violated federal law.

4022.4032.    When Plaintiff LeRette returned from maternity leave in the fall of 2022, she was temporarily restricted to light duty by her physician's order.

4023.4033.    Plaintiff LeRette's first day back at work after her maternity leave was November 7, 2022.

4024.4034.    Defendants Champaigne and Pope removed Plaintiff

13

LeRette from her narcotics assignment and reassigned her to the property room while she was on light duty following the birth of her child, despite ample available work in that narcotics assignment and no medical restrictions that would prevent Plaintiff LeRette from being a valuable part of the narcotics investigation team.

4025.4035.    Additionally, Plaintiff LeRette was given strict rules, including being prohibited from carrying a firearm, driving a department vehicle, or leaving the station during work hours.

4026.4036.    Male officers placed on temporary light duty were treated more favorably.

4027.4037.    For example, previous male officers assigned to temporary light duty were not removed from their regular assignments, prohibited from carrying firearms, prohibited from operating department vehicles, or prevented from leaving the station during work hours.

4028.4038.    The only two other people assigned to the property room during this time were another female officer, Kelsey Davis, and a male officer who was still in training.

4029.4039.    The property room has historically been used as a punitive assignment for officers who have been disciplined, as in the case of Sergeant Kirchoff. Many officers, detectives, and administration staff, including the Chief of Police, who were temporarily restricted to light duty were never required to work in the property room. Plaintiff LeRette was placed into the property room and restricted as alleged above due to her sex and pregnancy.

14

4030.4040.    It was obvious to Plaintiff LeRette and others that Lieutenant Pope's decisions with respect to Plaintiff LeRette were not born of any concern for LeRette's welfare, because Pope was openly hostile to LeRette in many different ways on many different occasions.

4031.4041.    Here is one example of Pope's hostility toward LeRette after LeRette returned from maternity leave: On November 9, 2022, Officer Kelsey Davis and Plaintiff LeRette had a required online training session to complete from their work stations in the property room, but Officer Nelson was not in the property room yet to let them in. (Other than Lieutenant Pope and Captain Champaigne, only Officer Nelson had access to the property room.) Officer Davis and Plaintiff LeRette stopped by the front desk in the Records Division, where Plaintiff LeRette was welcomed back to work by Tammi and Cynthia, civilian records employees. At that point, in front of the records division staff, Lieutenant Pope stormed into the records department and confronted Plaintiff LeRette and Officer Davis, saying angrily "Aren't you supposed to be in training right now?" Pope yelled at LeRette and Davis for not being at their stations in the property room. All records staff was shocked by Lieutenant Pope's hostile and unprofessional tone and demeanor. Then, after Officer Davis and Plaintiff LeRette returned to the Evidence Technician room to work on their training session and other assigned work, Lieutenant Pope, without warning, let herself into the Evidence Technician room and began to rummage through file cabinets, angrily slamming doors.

4032.4042.    From November of 2022 until September of 2023 Plaintiff LeRette experienced countless interruptions while expressing breast milk, including

interruptions from male janitorial staff, male members of the police department and Lieutenant Pope entering the shower stall, sighing loudly in disgust, and turning the lights off on Plaintiff LeRette while she was lactating. In particular, Plaintiff LeRette consented to suffer worry, stress, and humiliation in the period between April 28, 2023 and August 6, 2023.[1]

4033.4043.    On December 7, 2022, Lieutenant Pope called Plaintiff LeRette into her office and closed the door, to talk about a doctor's note Plaintiff LeRette had presented to the effect that Plaintiff LeRette should not be around fentanyl while nursing due to the potential for contamination of her breast milk. Lieutenant Pope told Plaintiff LeRette that she (Pope) didn't have the luxury of pumping breast milk after she

---

[1] The Department of Labor website says:

> Beginning April 28, 2023, an employer who violates an employee's right to reasonable break time and space to pump breast milk will be liable for appropriate legal or equitable remedies under the FLSA. Remedies may include employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages, compensatory damages and make-whole relief, such as economic losses that resulted from violations, and punitive damages where appropriate. These remedies are available regardless of whether the employee has also experienced retaliation.*

---

> * Please Note: Before April 28, 2023, remedies for violations of the reasonable break time and space requirements of the FLSA are limited to unpaid minimum or overtime wages. An employee who experienced retaliation may also seek additional remedies including, but not limited to, employment, reinstatement, lost wages and an additional equal amount as liquidated damages, compensatory damages and make-whole relief, such as economic losses that resulted from violations, and punitive damages where appropriate.

https://www.dol.gov/agencies/whd/fact-sheets/73-flsa-break-time-nursing-mothers (last accessed September 24, 2025.)

had given birth to her daughter and that her work did not allow for her to pump because she was too busy as a Barker's Island Event Coordinator.

4034.4044.    In late 2022 and early 2023, Plaintiff LeRette began to notice that Pope and Champaigne were treating her differently from her male counterparts (and from her female counterparts who had not taken maternity leave) with respect to time off from work and scheduling matters in general.

4035.4045.    On December 22, 2022, Detective Coffman told Plaintiff LeRette that he did not have to provide the same schedule information to Lieutenant Pope or adhere to the same deadline as Plaintiff LeRette did. Detective Coffman told Plaintiff LeRette he had submitted a request for approval of time off *after* having taken the time off without advance notice to Lieutenant Pope, and it was approved by Lieutenant Pope the following week.

4036.4046.    In January, 2023, Plaintiff LeRette asked for permission to modify her work schedule from five eight-hour days per week to four ten-hour days per week. Detective Coffman, Officer Deignan, Detective Milroy, Detective Mattson, and others had been permitted to modify their schedules in this way. Captain Champaigne told Plaintiff LeRette that not requiring her to work five eight-hour days would mean her narcotics partner would not have as much support from her since he would be on duty alone one day a week. In fact, Plaintiff LeRette was on duty from one to three days a week without the support of her partner since he was gone working on collateral assignments.

4037.4047.    The Superior Police Department had a schedule accessible

electronically through an application known as "Planit Police." Changes in work hours, time off, etc., were typically communicated by Detectives to their supervisors who would enter the changes in the Planit Police application.

4038.4048.    On February 23, 2023, Lieutenant Pope questioned Plaintiff LeRette about why she was working on that day but was not shown as scheduled to work on the electronic schedule.  Plaintiff LeRette accurately responded that she had conveyed her schedule to Captain Champaigne, who was expected to enter it into the electronic system.

4039.4049.    Lieutenant Pope began to frequently question Plaintiff LeRette about not having her schedule updated in the scheduling system, when, in almost every case, Plaintiff LeRette had appropriately submitted schedule changes or time off requests to Pope or Champaigne and they had neglected to properly enter them into the system.

4040.4050.    In a few cases, Plaintiff LeRette was at fault in failing to forward schedule changes or time off requests to her superiors, but almost all of the staff using the system, including Pope and Champaigne, made similar errors. For example:

4041.4051.    On March 14, 2023, Lieutenant Pope was at work but was not on the schedule in Planit Police.

4042.4052.    On April 21, 2023, Lieutenant Pope had to miss part of the day due to a doctor's appointment, but did not update the Planit Police application and was thus shown as scheduled to work the entire day.

4043.4053.    On September 18, 2023, despite weekly meetings with Lieutenant Pope, and never having any performance measures addressed during these weekly meetings, Lieutenant Pope and Captain Champaigne called Plaintiff LeRette and Investigator Custer to have a meeting. Lieutenant Pope told Plaintiff LeRette and Custer they were not "cutting it" in their narcotics assignment. Lieutenant Pope said they were not doing enough "controlled buys" or "garbage pulls" and that their collateral assignments had to take a back seat. After this meeting Plaintiff LeRette was required to submit a daily activity log and she did this.

4044.4054.    There was reason to doubt the sincerity of the stated concerns of Pope and Champaigne with Plaintiff LeRette's job performance, because Lieutenant Pope had previously told Plaintiff LeRette that she needed to conduct background investigations even though this was a collateral assignment, and had criticized Plaintiff LeRette for "spending too much money" on controlled buys.

4045.4055.    There was also reason to doubt the sincerity of the stated concerns of Champaigne with Plaintiff LeRette's job performance, because after this meeting Lieutenant Pope was out of town for several months on a training assignment, and the weekly meetings, which had been planned and would have afforded an opportunity to counsel LeRette and Investigator Custer on their progress, or lack thereof, in meeting her superiors' expectations, occurred only twice over the course of several months.

4046.4056.    In early December, 2023, the Northwestern Area Crime Unit (NACU) Grant for funding the City of Superior Police Department Narcotics

Investigators (Plaintiff LeRette and Investigator Custer) came to an end. Soon-to-be Chief Winterscheidt made a plan to send one narcotics investigator to the Lake Superior Violent Offender Task Force in Duluth, Minnesota, which was fully funded, where there was already a working operating agreement with the Superior Police, and where Investigator Monte of the Superior Police already worked.  Plaintiff LeRette was the senior Narcotics Investigator, and Chief Winterscheidt told Lieutenant Pope and Captain Champaigne that Plaintiff LeRette would be moved to the Lake Superior Violent Offender Task Force at the beginning of the year as a result of the NACU grant expiring.

4047.4057.    On December 18, 2023, Nikki Kalan and Officer Nelson reported to Plaintiff LeRette that Lieutenant Pope had been asking people, including them, at the Department Christmas party, to reveal whether Plaintiff LeRette is pregnant again.

4048.4058.    On December 29, 2023, Plaintiff LeRette had conversation with Investigator Monte about his schedule requirements and notifying Lieutenant Pope concerning scheduling matters. Investigator Monte stated he only has told Superior Police supervisors (Lieutenant Pope and Captain Champaigne) if he is working out of the immediate area of the twin ports region. Investigator Monte has always told Sergeant Wilson with the Lake Superior Task Force when he has a doctor's appointment or anything regarding his work schedule. Captain Champaigne has stated in an email that he "has always" required employees reporting to duty outside of the Superior Police Department, to report to three supervisors every time they deviate from

their "assignment," but Investigator Monte says he has worked in Duluth for 14 years and has never been subject to these requirements.

4049.4059.    In the winter of 2023-2024, Officers Amanda Mundell, Lauren Phillips, and Ashley Johnson made numerous comments to Plaintiff LeRette about how they were fearful of getting pregnant and starting a family while employed by the Superior Police Department due to how Plaintiff LeRette was being treated during her pregnancy and after returning to work.

4050.4060.    In late 2023 or early 2024, Defendants Kiel, Harriman, Champaigne, and Pope, individually and collectively, came to believe that it might be possible to develop evidence that could be used in an attempt to impose severe, career-damaging, discipline upon Plaintiff LeRette related to her work hours, which were necessarily flexible and often unpredictable given that she was a narcotics investigator frequently in the field pursuing leads where and when they arose.

4051.4061.    There are different approaches available to a supervisor who believes that a subordinate employee may not understand her superiors' expectations regarding her work hours or may not understand the importance of these expectations to her superiors.

4052.4062.    One such approach, favored by Human Resources professionals and embedded in the City of Superior Police Department labor management collective bargaining agreement, is for a supervisor to speak informally with the subordinate employee and simply communicate the relevant expectations, emphasizing their importance to the organization, and then to monitor the subordinate

21

employee's performance to see whether the conversation has had the intended effect.

4053.4063.    At the other end of the spectrum of possible approaches to such a situation is to treat the subordinate employee's possible misunderstandings regarding work hours expectations as a potential serious offense, to be investigated as one would investigate a serious crime, i.e., keeping any suspicions or allegations secret from the subordinate employee so she has no opportunity to conform her conduct to her superiors' expectations, gather evidence until a truly impressive quantity has been stockpiled, and then, in one fell swoop, to impose the most serious jeopardy available in the hope that the subordinate employee will be so daunted by the prospect of seemingly inevitable sanctions that she will not contest the matter.

4054.4064.    Defendants Kiel, Harriman, Champaigne and Pope chose to take the second approach with regard to Plaintiff LeRette's work hours.

4055.4065.    On February 28, 2024, Plaintiff LeRette was still employed as an investigator for the City of Superior Police Department, assigned to the Lake Superior Violent Offender Task Force in Duluth.

4056.4066.    On or before that date, defendant Champaigne placed an electronic tracking device on the police vehicle that had been assigned to plaintiff LeRette and made available for her use, including transportation to and from her home.

4067.    Captain Champaigne did not have a warrant authorizing the installation of the tracking device.

4068.    The installation of the tracking device was an unreasonable search in violation of the Fourth Amendment because it was not "justified at its inception."

22

*O'Connor v. Ortega*, 480 U.S. 709, 725-726 (1987) since it could provide no meaningful information concerning whether Plaintiff LeRette was putting in less than her required number of work hours.

4069.   Lake Superior Violent Offender Task Force members and Superior Police Department Narcotics Investigators were commonly permitted to work from home and were expected to work flexible hours, meaning that they were not expected to start and stop work at predetermined set times of day, since they were often required to respond to unexpected communications or developments that it was impossible to plan for, whether these communications and developments occurred within any set of stated working hours.

4070.   Thus, a tracking device that could provide information to Plaintiff LeRette's superiors about what time she left home provided no conclusive information about what time she began her work on a given day.

4057.4071.     The installation of the tracking device was not part of a a good faith investigation of suspected employee misconduct, but rather part of a campaign of discrimination and retaliation waged against Plaintiff LeRette because of her sex, pregnancy, childbirth, and maternity.

4058.4072.     A few days after the tracking device was installed, plaintiff LeRette surrendered her assigned police vehicle for some repair work.

4059.4073.     Captain Champaigne at that time removed the electronic tracking device from plaintiff LeRette's assigned police vehicle and installed it on the vehicle that was temporarily assigned for her use while her regular vehicle was in the

23

shop for repairs.

4060.4074.    Captain Champaigne did not have a warrant to install electronic tracking device on the vehicle that was temporarily assigned to plaintiff LeRette.

4061.4075.    Captain Champaigne has stated that he removed the tracking device on March 8, 2024, due to his pending retirement.

4062.4076.    Captain Champaigne retired from the Superior Police Department effective March 8, 2024, and was replaced as Captain of Investigations by Captain Jeffrey Harriman.

4063.4077.    However, an investigation of Plaintiff LeRette commissioned by the Superior Police Department purports to have found that an electronic tracking device was still being used on plaintiff LeRette's assigned police vehicle as of March 25, 2024.

4064.4078.    It is unknown when the unlawful practice was terminated.

4065.4079.    Plaintiff LeRette never consented to the installation of any tracking devices on her assigned police vehicle.

4066.4080.    On or about March 7, 2024, Lieutenant Pope invited all of the investigative division to attend an undercover camera course, specific to undercover narcotics investigations, taught by Investigator Monte of the Lake Superior Violent Offender Task Force. Lieutenant Pope excluded Plaintiff LeRette from this invitation, and she was the only person in her division not invited to attend this training session.

4067.4081.    Plaintiff LeRette attended the training session despite not

being invited and was quite obviously shunned and ignored by Lieutenant Pope.

Lieutenant Pope made an effort to say hello to everyone at the training session except

Plaintiff LeRette. This cold-shoulder treatment confirmed Plaintiff LeRette's suspicion

that she had been intentionally excluded from the training invitation list.

4068.4082.    On March 12, 2024, a search warrant obtained by Plaintiff

LeRette as a result of her investigative efforts was executed in Superior. After the

operation, Lieutenant Pope spoke to Plaintiff LeRette in such a hostile manner that it

was obvious to Plaintiff LeRette she was being treated unfairly and targeted by

Lieutenant Pope, regardless of what she did, or didn't do, or how hard she worked.

4069.4083.    In desperation, Plaintiff LeRette spoke to her new Captain,

Harriman, about how poorly she was being treated by Lieutenant Pope. Plaintiff

LeRette told Captain Harriman it was obvious that she could do nothing right in

Lieutenant Pope's opinion, and that Pope went out of her way to criticize LeRette and

create roadblocks for her, to manufacture scheduling problems, conveying her feelings

by dirty looks, body language, telling LeRette, in front of other people, how bad she

looked, micromanaging what she could and could not work on in investigations, and

how she conducted investigations, among other things.

4070.4084.    It soon became apparent that Harriman would not intervene

to set things right and that he might even be in on the campaign to drive LeRette out of

the department. In April of 2024, Captain Harriman addressed Plaintiff LeRette's

schedule with regard to LeRette having various doctor's appointments. Captain

Harriman told Investigator LeRette that he wanted her to put in for time off if she was

coming up short of 40 hours in any given week, and that if she worked in excess of 40 hours, he wanted her to submit overtime. This was the third inconsistent set of directions with respect to scheduling requirements given to Plaintiff LeRette and it went against union contract language.

4071.4085.   Also in April of 2024, Investigator Monte spoke with Captain Harriman, and Harriman told Monte that Harriman did not need to know if Monte and LeRette were coming in late or staying over their stated shifts because their work was within the "footprint" of the task force. Harriman said Monte and LeRette did not need permission to work overtime or to come in early or stay late. Investigator Monte relayed this information to Plaintiff LeRette.

4072.4086.   Later in April, 2024, Sergeant Wilson of the Lake Superior Violent Offender Task Force and Plaintiff LeRette met regarding the search warrant executed on March 12, 2024. Sergeant Wilson told Plaintiff LeRette that it was clear to him that Lieutenant Pope had an issue with her and appeared to be targeting her. Sergeant Wilson said that Captain Harriman wanted him to relay to Harriman every time Plaintiff LeRette and Investigator Monte altered their schedules.

4073.4087.   On May 23, 2024, Plaintiff LeRette sent an email to Captain Harriman and another addressee, stating that she planned for her last working day before maternity leave for her second child to be May 23 or 24, depending on how she was feeling related to the pregnancy. As it turned out, May 24 was her last working day before she went on maternity leave.

4074.4088.   Although she had made it clear she would be gone on

maternity leave after that, and had arranged for the return of her police car, she had inadvertently not properly requested time off for May 29 and 31 and June 4.

4075.4089.    On June 17, 2024, Captain Harriman asked Plaintiff LeRette when she had started with her six weeks of paid parental leave. Plaintiff LeRette had already submitted this information to Human Resources and also to Administrative Assistant Nikki Kalan. Plaintiff LeRette believed she was already off according to the schedule for six weeks of paid-time-off parental leave. Captain Harriman asked about May 29 and 31 and June 4. Plaintiff LeRette said to mark her off as vacation for all of those dates as they had not been previously entered as off-work dates on the schedule. Plaintiff LeRette said: MARK ME OFF VACATION THOSE SHOULD HAVE ALL BEEN TIME OFF. Captain Harriman never did this. Captain Harriman said there was "no rush" to get this figured out.

4076.4090.    The individual defendants later accused Plaintiff LeRette of intentional wrongdoing and dishonesty with respect to her failure to claim these days off in advance, despite the fact that Superior Police officers have frequently taken time off without advance notice, and often updated their schedules, after the fact, and sometimes not updated their schedules even after the fact, such that their accrued time off would not be depleted, including some or all of the same administrators who later accused Plaintiff LeRette of dishonesty.

4077.4091.    Plaintiff LeRette returned from FMLA parental leave, after her second pregnancy, on September 17, 2024.

4078.4092.    On that date, Plaintiff LeRette was allowed to go to the

27

federal Drug Enforcement Administration (DEA) headquarters in Minneapolis to be sworn in as a Task Force Officer, a status which she had achieved after a thorough background investigation of her conducted while she was on maternity leave.

4079.4093.    Captain Harriman told Plaintiff LeRette that due to her "light duty" status, she was not allowed to take a city vehicle to Minneapolis or carry a firearm. These restrictions had not been placed on male officers who were on temporary light duty because of injury or illness, and these restrictions applied during her drive down to Minneapolis.

4080.4094.    On September 17, 2024, Investigations Captain Jeffrey Harriman and Assistant Chief John Kiel served Plaintiff LeRette with a Notice of Internal Investigation.  Alleged policy violations included attendance violations, tardiness, insubordination, and theft or misuse of public funds. Plaintiff LeRette was required to turn in her firearm, badge, department keys, and police identification card, and was banned from the entire City of Superior government center, not just the police department.

4081.4095.    The list of alleged infractions in the Notice of Internal Investigation reflected subject matter identical to issues addressed with Plaintiff LeRette during background investigation interviews which occurred in June and August 2024, pertaining to her position with the Lake Superior Violent Offender Task Force (LSVOTF) and a Task Force Officer (TFO) position with the Drug Enforcement Administration (DEA).

4082.4096.    Command staff provided allegations to the background

28

investigator without first conducting a formal investigation, without notice to Plaintiff LeRette, and without following progressive discipline.

4083.4097.     Neither the City of Superior Human Resource leave policy, the Superior Police Department administrative leave policy, nor the Police and Fire Commission process § 705(5) for suspension pending disposition of charges were followed.

4084.4098.     The only explanation given to Plaintiff LeRette and her Union for Plaintiff LeRette being placed on administrative leave was the statement, "you don't work in the same building as us," provided by Assistant Chief Kiel.

4085.4099.     The Union was informed by Assistant Chief Kiel that Human Resources Director Cammi Janigo provided him with the authority to make such decisions.

4086.4100.     The improper imposition of mandatory leave directly contributed to Plaintiff LeRette being prevented from providing exculpatory evidence during her interrogation by the contracted investigator, Daniel Hardman.

4087.4101.     This disciplinary investigation was initiated by Captain Harriman and Assistant Chief Kiel without the knowledge of the Chief of Police or the involvement of the Police and Fire Commission.

4088.4102.     Assistant Chief Kiel informed the Union during the interrogation of Plaintiff LeRette that he was empowered by Human Resources Director Janigo and the City to take disciplinary actions against Plaintiff LeRette.

4089.4103.     During a later meeting with City representatives, Plaintiff

LeRette and the Union were informed by Human Resources Director Janigo that the disciplinary authority given to Assistant Chief Kiel was provided by the job description for the position of Assistant Chief.

4090.4104.    The City was clearly acting outside of Wis. Stat. § 62.13(5)[2]

---

[2] Wis. Stat. § 62.13(5) provides:

Disciplinary actions against subordinates.

(a) A subordinate may be suspended as hereinafter provided as a penalty. The subordinate may also be suspended by the commission pending the disposition of charges filed against the subordinate.

(b) Charges may be filed against a subordinate by the chief, by a member of the board, by the board as a body, or by any aggrieved person. Such charges shall be in writing and shall be filed with the president of the board. Pending disposition of such charges, the board or chief may suspend such subordinate.

(c) A subordinate may be suspended for just cause, as described in par. (em), by the chief or the board as a penalty. The chief shall file a report of such suspension with the commission immediately upon issuing the suspension. No hearing on such suspension shall be held unless requested by the suspended subordinate. If the subordinate suspended by the chief requests a hearing before the board, the chief shall be required to file charges with the board upon which such suspension was based.

(d) Following the filing of charges in any case, a copy thereof shall be served upon the person charged. The board shall set date for hearing not less than 10 days nor more than 30 days following service of charges. The hearing on the charges shall be public, and both the accused and the complainant may be represented by an attorney and may compel the attendance of witnesses by subpoenas which shall be issued by the president of the board on request and be served as are subpoenas under ch. 885.

(e) If the board determines that the charges are not sustained, the accused, if suspended, shall be immediately reinstated and all lost pay restored. If the board determines that the charges are sustained, the accused, by order of the board, may be suspended or reduced in rank, or suspended and reduced in rank, or removed, as the good of the service may require.

(em) No subordinate may be suspended, reduced in rank, suspended and reduced in rank, or removed by the board under par. (e), based on charges filed by the board, members of the board, an aggrieved person or the chief under par.

(b), unless the board determines whether there is just cause, as described in this paragraph, to sustain the charges. In making its determination, the board shall apply the following standards, to the extent applicable:

> 1. Whether the subordinate could reasonably be expected to have had knowledge of the probable consequences of the alleged conduct.

> 2. Whether the rule or order that the subordinate allegedly violated is reasonable.

> 3. Whether the chief, before filing the charge against the subordinate, made a reasonable effort to discover whether the subordinate did in fact violate a rule or order.

> 4. Whether the effort described under subd. 3. was fair and objective.

> 5. Whether the chief discovered substantial evidence that the subordinate violated the rule or order as described in the charges filed against the subordinate.

> 6. Whether the chief is applying the rule or order fairly and without discrimination against the subordinate.

> 7. Whether the proposed discipline reasonably relates to the seriousness of the alleged violation and to the subordinate's record of service with the chief's department.

(f) Findings and determinations hereunder and orders of suspension, reduction, suspension and reduction, or removal, shall be in writing and, if they follow a hearing, shall be filed within 3 days thereof with the secretary of the board.

(g) Further rules for the administration of this subsection may be made by the board.

(h) No person shall be deprived of compensation while suspended pending disposition of charges.

(i) Any person suspended, reduced, suspended and reduced, or removed by the board may appeal from the order of the board to the circuit court by serving written notice of the appeal on the secretary of the board within 10 days after the order is filed. Within 5 days after receiving written notice of the appeal, the board shall certify to the clerk of the circuit court the record of the proceedings, including all documents, testimony and minutes. The action shall then be at issue and shall have precedence over any other cause of a different nature pending in the court, which shall always be open to the trial thereof. The court shall upon application of the accused or of the board fix a date of trial, which shall not be later than 15 days after such application except by agreement. The trial shall be

and the collective bargaining agreement.

4091.4105.    The Union informed the City of this fact at every meeting with any City official.

4092.4106.    The internal investigation alleged schedule policy violations arising from facts that had been known to command staff since at least February, 2024, yet no prior action, notice, formal counseling, or progressive discipline had occurred.

4093.4107.    Plaintiff's LeRette's work schedule was consistent with past practice and authorized by the Chief of Police for all investigative personnel exempt under Article 8(A); no written agreement was made to revoke or alter this schedule as required by Article 8(D).

4094.4108.    The internal investigation was conducted in a hostile and unprofessional manner by a contracted investigator, Daniel Hardman, who is at minimum, a personal acquaintance of Assistant Chief Kiel and Captain Harriman.

4095.4109.    Daniel Hardman conducted an investigation which ignored exculpatory evidence, verbally disparaged Plaintiff's LeRette, ignored exculpatory

---

by the court and upon the return of the board, except that the court may require further return or the taking and return of further evidence by the board. The question to be determined by the court shall be: Upon the evidence is there just cause, as described under par. (em), to sustain the charges against the accused? No costs shall be allowed either party and the clerk's fees shall be paid by the city. If the order of the board is reversed, the accused shall be forthwith reinstated and entitled to pay as though in continuous service. If the order of the board is sustained it shall be final and conclusive.

(j) The provisions of pars. (a) to (i) shall apply to disciplinary actions against the chiefs where applicable. In addition thereto, the board may suspend a chief pending disposition of charges filed by the board or by the mayor of the city.

witnesses and statements, failed to follow the Personnel Complaints Policy of the Superior Police Department, and intentionally did not consider union contract provisions.

4096.4110.     Of specific concern, Daniel Hardman altered Human Resources Director Janigo and Assistant Chief Kiel's decision to allow Plaintiff LeRette access to her emails and departmental records which would provide details of her schedule and work activities.

4097.4111.     Human Resources Director Janigo and Assistant Chief Kiel ultimately blocked Plaintiff LeRette from accessing her records, thus making exculpatory evidence unavailable at her interrogation and throughout the investigation.

4098.4112.     City of Superior Police Department Command staff admitted to deploying a GPS tracker on Plaintiff LeRette's vehicle without legal justification, notice, or supervisory oversight—potentially violating Wisconsin law, privacy rights, and department policy, and violating federal rights protected under the Fourth Amendment of the United States Constitution.

4099.4113.     Unsubstantiated disciplinary allegations were prematurely disclosed to federal task force officials and the Douglas County District Attorney, undermining Investigator LeRette's role with the Lake Superior Violent Offender Task Force (LSVOTF) and interfering with a special assignment governed by Article 20(G)(2) of the collective bargaining agreement.

4100.4114.     The suspension occurred immediately following Investigator LeRette's protected parental leave, and in close proximity to her union-related

advocacy.

4101.4115.    The internal investigation has caused tangible harm to Investigator LeRette's career: she was recently denied a position with a neighboring agency and was told to allow "time and space" from the investigation before reapplying.

4102.4116.    Additionally, unsubstantiated allegations delivered to the Douglas County District Attorney have jeopardized Plaintiff LeRette's continued appointment as a narcotics investigator.

4103.4117.    After the Hardman investigation was concluded, Plaintiff LeRette obtained copies of both the Hardman report and the report of the background investigation conducted by the DEA in the summer of 2024 prior to that agency's acceptance of Plaintiff LeRette as a Task Force Officer.

4104.4118.    In reviewing these reports, Plaintiff LeRette learned that the individual Defendants had made many false and damaging statements to the investigators.

4105.4119.    The City has failed to submit any complaint, legitimate or otherwise, to the lawful authority of the Police and Fire Commission.

4106.4120.    The City has elected to do this after Mayor Paine identified what he termed "mitigating factors." Despite the presence of "mitigating factors," the City has intentionally issued communications, both private and public, that have damaged Plaintiff LeRette's career and reputation.

4107.4121.    The mayor did, however, on January 16, 2025, in reliance on

the findings in the tainted investigatory report by Hardman, impose a written warning, which remains in Plaintiff LeRette's supervisory file.

## V.    BASIS OF LIABILITY

### A.    Fair Labor Standards Act.

#### 1.    Lactation Violation.

501.    The Defendant, City of Superior, violated Plaintiff LeRette's rights to be afforded reasonable breaks from work and reasonable facilities to express her breast milk after she returned to work from maternity leave on or about November 227, 2022. These violations were committed by the City's final policymaking officials and were thus actionable prior to the effective date of the PUMP for Nursing Mothers Act ("PUMP Act"), December 29, 1922, under the 2010 Break Time for Nursing Mothers law and 42 U.S.C. Sec. 1983, and continued after the effective date of the Pump Act and after the effective date of legislation expanding remedies for violations on April 28, 2023, and through the August 6, 2023, expiration of the Act's protections one year after the birth of Plaintiff LeRette's child.

### B.    The Fourth Amendment

#### 1.    Individual Defendant

502.    The installation of an electronic tracking device on Ms. LeRette's assigned police vehicle violated rights secured to her by the Fourth Amendment to the United States Constitution because it was not justified at its inception by any good faith

investigation of employee misconduct on Plaintiff LeRette's part. *United States v. Jones*, 565 U.S. 400 (2012); *United States v. Felton*, No. 19-CR-30035, 2021 WL 3722288, at *5 (C.D. Ill. Aug. 23, 2021).

### C.    The Equal Protection Clause

503.    The individual Defendants have violated Plaintiff LeRette's rights under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution to be free from discrimination on the bases of sex, pregnancy, childbirth and maternity.

### D.    Sec. 895.46, Wis. Stats.

504.    Defendant City of Superior, Wisconsin, is liable for the unlawful acts of the individual defendants because they were acting within the scope of their employment pursuant to Sec. 895.46, Wis. Stats.  The Plaintiff does not allege that the wrongful acts alleged herein were carried out pursuant to a custom or policy of the City of Superior.

## VI. DAMAGES.

### E.    Compensatory Damages.

601.    By virtue of the unlawful actions of the Defendant alleged above, the Plaintiff suffered injuries, for which she seeks an award of compensatory damages in an amount deemed just by the Court.

F.    **Punitive Damages**

602.    Because the acts of the individual Defendants herein alleged were carried out with reckless disregard for the Plaintiff's fundamental rights, the Plaintiff also seeks an award of punitive damages against the individual Defendants to deter them and others similarly situated from committing similar wrongful acts in the future.

## VII. CONDITIONS PRECEDENT

701.    All conditions precedent to this action within the meaning of Rule 9(c), Fed. R. Civ. Pro., have been performed or have otherwise occurred.

## VIII. PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays the Court to grant a judgment against the Defendants awarding her damages, costs, attorney's fees and such other and further relief as the Court deems just.

Dated this Friday, October 3, 2025.

Respectfully submitted,

Mikayla Marie LeRette,

Plaintiff,

By

GONDIK LAW, S.C.
RICHARD S. GONDIK, JR.
State Bar Number 1011331
1215 Belknap St.
Superior, WI 54880-2820
Phone:         (715) 395-3180
Fax:            (715) 394-7786
Email:         richardgondik@gmail.com


THE JEFF SCOTT OLSON LAW FIRM, S.C.
JEFF SCOTT OLSON
State Bar Number 1016284
1025 Quinn Drive, Suite 500
Waunakee, WI  53597-2502
Phone:         608 283-6001
Fax:            608 283 0945
E-mail:         jsolson@scofflaw.com


/s/    Jeff Scott Olson
_____

Jeff Scott Olson

ATTORNEYS FOR PLAINTIFF