IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MIKAYLA MARIE LERETTE,

                              Plaintiff,

    v.

CITY OF SUPERIOR, THOMAS CHAMPAIGNE,
JOHN KIEL, JEFFREY HARRIMAN, and
MICHELLE POPE

                           Defendant.

**OPINION and ORDER**

25-cv-183-jdp

---

Plaintiff Mikayla LeRette worked as a narcotics investigator for the City of Superior Police Department. Defendants Thomas Champaign, John Kiel, Jeffrey Harriman, and Michelle Pope were her superiors. LeRette contends that defendants violated her rights in various ways after she became pregnant with her first child in 2022. Specifically, she says that defendants discriminated against her on the basis of sex, pregnancy, and maternity status in violation of the Equal Protection Clause of the Fourteenth Amendment, failed to provide her with an appropriate place to pump breast milk in violation of the Fair Labor Standards Act (FLSA), and installed a GPS tracking device on her police vehicle in violation of the Fourth Amendment.

Defendants move for summary judgment on all of LeRette's claims, Dkt. 32, and the court will grant the motion. As for the equal protection claims, most of defendants' conduct was unrelated to LeRette's sex, pregnancy, and maternity status, and the few comments that were related were not significant enough to be actionable. As for the FLSA claim, it is undisputed that defendants provided LeRette with an adequate place to pump breast milk, which LeRette chose not to use. And as for the Fourth Amendment claims, defendants are

entitled to qualified immunity because there is no clearly established law barring GPS tracking of employer-owned work vehicles.

## PRELIMINARY EVIDENTIARY ISSUES

The court begins with two evidentiary issues.

First, one week after LeRette filed her summary judgment materials, she moved to supplement her counsel's declaration to add two exhibits. Dkt. 48. LeRette explained that she filed these materials late because her counsel learned that they were not in defendants' discovery materials and had to obtain them from LeRette directly. Defendants did not file an opposition brief to the motion to supplement, nor did they object to these exhibits in their reply brief. The court will grant LeRette's motion to supplement as unopposed.

Second, defendants object to many of LeRette's proposed findings of fact on the basis that they are not supported by admissible evidence. On summary judgment, parties must provide proposed findings of fact supported by citations to the record. *See* Fed. R. Civ. P. 56(c)(1)(A); *Standard Attachments for Civil Cases Assigned to Judge Peterson,* attachment to Dkt. 10, at 2, § I.B. Cited evidence must be "admissible to the same extent as at trial, at least if the opposing party objects, except that testimony can be presented in the form of affidavits or transcripts of sworn testimony rather than in person." *Steffek v. Client Servs., Inc.*, 948 F.3d 761, 769 (7th Cir. 2020); *see also* Fed. R. Civ. P. 56(c)(2). If one side objects to a proposed fact on the ground that the supporting evidence is inadmissible, then the court must consider the evidentiary objection before relying on that fact in its decision. *Steffek*, 948 F.3d at 769.

The problems with LeRette's proposed findings of fact fall into two categories: foundation issues and hearsay issues.

### 1. Foundation issues

"A [lay] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602; *see also Ani-Deng v. Jeffboat, LLC*, 777 F.3d 452, 454 (7th Cir. 2015). At the summary judgment stage, declarations and affidavits from lay witnesses must establish foundation for the witness's personal knowledge. Statements in declarations and affidavits that lack foundation must be disregarded. *Id.*

In this case, LeRette relies on her own declaration to support many of her proposed findings of fact, but she doesn't provide foundation for some of the statements in the declaration. A portion of LeRette's proposed finding of fact 78 is representative of the foundation issue. That portion reads as follows:

> [LeRette] was treated differently than her male counterparts with respect to schedule reporting . . . Detective Coffman was allowed to provide his schedule on the Sunday before the start of his week, and Officer Deignan was allowed to change his schedule mid-week to help with childcare . . . (LeRette Declaration, Exhibit 555, at 6).

Dkt. 52, ¶ 78.[1] Exhibit 555 is a letter that LeRette wrote in response to an internal police department investigation, which she incorporated into her declaration by reference. Dkt. 45, ¶ 126. The relevant portion of the letter reads as follows:

> I was apparently subjected to different standards than my male counterparts . . . Detective Coffman was allowed to provide his schedule on the Sunday before the start of his week, and Officer

---

[1] This proposed fact also violates the court's summary judgment procedures, which require parties to limit each fact "as nearly as practical to a single factual proposition" and to avoid factual propositions "inflated with lengthy arguments." *See* Motions for Summary Judgment at 1 and § I.B.3, attached to Dkt. 10. This proposed fact contains multiple propositions, some of which are more accurately characterized as conclusions or arguments.

> Deignan was allowed to change his schedule mid-week to help with childcare. . . .

Dkt. 45-5, at 6. Defendants objected to LeRette's statements about Coffman and Deignan's work schedules on foundation grounds, and the court agrees. LeRette did not explain how she knows what Coffman or Deignan were allowed to do with their work schedules. The court cannot consider that statement or any of the other statements in her declaration that lack foundation.

### 2. Hearsay issues

Defendants have also objected to many of LeRette's proposed findings of fact on hearsay grounds. There are two types of hearsay issues.

First, in her declaration, LeRette describes multiple discriminatory statements that the defendants made to LeRette's coworkers, which the coworkers then relayed to LeRette. For instance, LeRette says that "[i]n the spring of 2022, Assistant Chief of Police John Kiel began making numerous comments about my pregnancy in front of members of the police department. I know this in part because serving officers told me about it." Dkt. 45, ¶ 10. LeRette argues that these statements are admissible under Federal Rule of Evidence 801(d)(2)(D), which classifies certain statements made by an opposing party's agents or employees as "not hearsay." But Rule 801(d)(2)(D) applies only to statements made within the scope of the agency or employment relationship. *See Stephens v. Erickson*, 569 F.3d 779, 793 (7th Cir. 2009) (Rule 801(d)(2)(D) statements must relate to an employee or agent's job duties). LeRette's coworkers were simply repeating office gossip; they were not relaying statements that they heard while performing their official duties as police officers. These statements are inadmissible hearsay.

Second, some of LeRette's proposed findings of fact rely on materials from two investigations that the police department conducted into LeRette's conduct. For instance, LeRette relies on statements that her coworkers made during interviews with investigators, Dkt. 52, ¶¶ 79, 82, and on factual statements that the investigators put into their reports. *Id.* ¶¶ 161–64. The coworker statements and the investigator reports are hearsay, so the court cannot consider them for the truth of the matter asserted.

Many of LeRette's proposed facts suffer from either a foundation or hearsay problem, and the court will not go through each one individually. With the understanding that the court will consider LeRette's factual propositions only where supported by admissible evidence, the court will proceed to a summary of the facts.

UNDISPUTED FACTS

The parties submitted more than 350 proposed findings of fact covering years of events. The following is an overview of the facts; additional details will be presented as they become relevant to the analysis. These facts are not genuinely disputed, except where noted.

Plaintiff Mikayla LeRette began working as a City of Superior police officer in 2013. She initially worked as a patrol officer, but in 2020, she was promoted to a narcotics investigator position. LeRette's spouse is Paul Winterscheidt, who in the spring of 2022 was the police department's patrol captain. In 2024, Winterscheidt became the chief of police.

As a narcotics investigator, LeRette's immediate supervisor was defendant Michelle Pope. Pope's supervisor was defendant Thomas Champaigne, the captain of investigations. In March 2024, Champaigne was succeeded in this position by defendant Jeffrey Harriman. Defendant John Kiel was the assistant chief of police.

5

### 1. LeRette's first pregnancy, maternity leave, and return to work

In March 2022, LeRette told Pope that she was pregnant with her first child, due in August. Pope and Champaigne asked the city's human resources department whether LeRette should be removed from her narcotics assignment because of her pregnancy, but HR advised them not to do so. LeRette says that Kiel told her that she should have to wear a "matron skirt" and answer desk calls while pregnant. Kiel denies making these comments.

In August 2022, LeRette went on maternity leave. She returned to work in November but was restricted to light duty for six weeks per her physician's orders. Pope assigned LeRette to the property room for the duration of her light duty, an assignment that LeRette perceived as a punishment. Pope also restricted her from carrying a firearm, driving a department vehicle, or leaving the police station during work hours.

### 2. Lactation accommodations

When LeRette was on maternity leave in the fall of 2022, she told Pope that she would need a suitable place to pump breast milk when she returned to work. LeRette suggested that she use a shower stall in the women's locker room and Pope responded that LeRette could pump wherever she felt most comfortable.

Shortly after returning to work, LeRette began having problems with interruptions while pumping in the women's locker room. She brought her concerns to the police chief, who suggested that LeRette use a designated lactation room on the third floor of the same building. *See* Dkt. 39-1; Dkt. 31 (LeRette Dep. 45:1–46:11). LeRette though the lactation room was too

far away from her work station and she believed that she had to make a reservation to use it.[2] She chose to continue using the women's locker room to pump.

### 3. Return to narcotics work and time reporting problems

LeRette's light-duty assignment ended in early 2023 and she returned to her role as a narcotics investigator. Narcotics investigators typically have flexible schedules. They communicate with their supervisors if they need to flex their schedules or if they need time off, and the supervisors enter schedule changes into the scheduling system.

Beginning in 2023, Pope and Champaigne began to suspect that LeRette was not accurately reporting her time, because the scheduling system did not always match up with the hours that it appeared LeRette was working. LeRette admits that she occasionally forgot to tell Pope and Champaigne when her schedule changed. But she says that other officers did that as well, and she attributes the problem partially to Pope and Champaigne, who sometimes forgot to enter LeRette's schedule changes into the system. Pope began requiring LeRette to provide her schedule one month in advance, which was not routinely required of other officers.

In December 2023, grant funding for LeRette's narcotics position ended. Winterscheidt, who had recently been appointed police chief, reassigned LeRette to work in Duluth, Minnesota, with the Lake Superior Violent Offender Task Force. LeRette's day-to-day tasks were managed by an onsite supervisor in Duluth, but Pope and Champaigne retained general supervisory authority over her.

After LeRette started working in Duluth, her supervisors continued to believe that LeRette was not accurately reporting her time. Champaigne drove past LeRette's residence on

---

[2] Reservations were not required to use the lactation room, Dkt. 51, ¶ 113, but that was LeRette's belief.

several occasions during work hours and saw her police vehicle there instead of at work. On one occasion, he saw her returning home with her child without reporting time off. LeRette admits that these things happened, but she says that they were not indicative of any wrongdoing because LeRette's supervisors in Duluth allowed her to work from home.

To investigate his suspicions about her time reporting, Champaigne decided to put a GPS tracker on LeRette's police vehicle.[3] Champaigne retired shortly thereafter and his successor Jeffrey Harriman left the GPS tracker in place. The tracker was on LeRette's vehicle for at least several weeks and possibly as long as three months.

### 4. Second maternity leave and investigation

In 2024, LeRette was pregnant with her second child, who was due in June. Her last working day was May 24, but her official maternity leave did not begin until June 6. After LeRette started maternity leave, Harriman noticed that LeRette had not requested time off for May 29, May 31, and June 4. Harriman texted LeRette about this issue and LeRette told Harriman that he could mark those days off as vacation.

That issue prompted Harriman to conduct a broader investigation into LeRette's timesheets. Harriman checked LeRette's computer activity and building access records and found inconsistencies between these records and LeRette's reported hours. Harriman also noticed that LeRette had made numerous after-the-fact changes to her timesheets. Harriman reported these findings to assistant police chief Kiel, the city attorney, and human resources, and they decided to initiate an internal investigation into whether LeRette had falsified her time sheets.

---

[3] LeRette's police vehicle was an unmarked vehicle, so it did not already have a GPS tracker.

LeRette returned from maternity leave in September 2024 and was immediately placed on paid administrative leave due to the pending investigation. By mid-November, LeRette had returned to work, although the investigation remained pending. In January 2025, the mayor issued LeRette a written warning, which went in her personnel file. Dkt. 45-4. LeRette was not otherwise disciplined.

After receiving the written warning, LeRette submitted a formal rebuttal letter denying that she had falsified her time sheets and asserting that Pope and Harriman had discriminated against her because of her sex. Dkt. 45-5. The city hired outside investigators to look into LeRette's allegations. The outside investigation was still underway in September 2025, when LeRette voluntarily resigned from the police department. In January 2026, the outside investigators found insufficient evidence to substantiate the allegations that LeRette had falsified her time sheets. Dkt. 46-25, at 7–8. The investigators also found insufficient evidence to substantiate LeRette's allegations of discrimination by Pope and Harriman. Dkt. 46-26 and 46-27.

ANALYSIS

LeRette's claims fall into three categories. First, she contends that Pope, Kiel, Champaigne, and Harriman violated the Equal Protection Clause of the Fourteenth Amendment by discriminating against her on the basis of pregnancy and maternity status. Second, she contends that the Superior Police Department violated the FLSA by not providing her an adequate place to pump breast milk after the birth of her first child. Third, she contends that Champaigne and Harriman violated her Fourth Amendment rights by placing a tracker on her police vehicle.

On a motion for summary judgment, the question is whether there are any genuine factual disputes that could make a difference to the outcome of the case, or, stated another way, whether a reasonable jury could find for the nonmoving party, after drawing all reasonable inferences in that party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Loudermilk v. Best Pallet Co., LLC,* 636 F.3d 312, 314–15 (7th Cir. 2011); *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010).

## A. Equal Protection Clause claims

LeRette assert claims against each of the individual defendants under 42 U.S.C. § 1983, contending that they discriminated against her on the basis of sex, pregnancy, and maternity status, in violation of the Equal Protection Clause of the Fourteenth Amendment.

To survive summary judgment on her equal protection claims, LeRette must adduce evidence that defendants, with intent to discriminate, treated her differently than similarly situated men or similarly situated women who were not pregnant or did not have children. *See Johnson v. City of Fort Wayne*, 91 F.3d 922, 944–45 (7th Cir. 1996). A plaintiff can demonstrate differential treatment by showing that the defendant took an adverse employment action against her because of her protected status. *See de Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 559 (7th Cir. 2019). A plaintiff can also demonstrate differential treatment by showing that the defendant intentionally engaged in severe or pervasive harassment because of her protected status. *See Trautvetter v. Quick*, 916 F.2d 1140, 1149 (7th Cir. 1990). The second pathway is analogous to a Title VII hostile work environment claim, with one key difference. In the equal protection context, the plaintiff must show that the defendant harassed her with intent to discriminate against her. *Bohen v. City of East Chicago,* 799 F.2d 1180, 1186–87 (7th Cir. 1986). Intent to discriminate is not an element of a Title VII hostile work environment claim. *Id.*

10

LeRette's equal protection claims appear to rest on a hostile work environment theory, because she doesn't tie her claims to specific adverse employment actions. Instead, LeRette argues that defendants subjected her to an "escalating series of discriminatory acts that, at least when taken together, affected the terms and conditions of her employment." Dkt. 47, at 33. The purportedly discriminatory acts fall into two categories. The first category consists of negative comments and generally rude behavior toward LeRette. The second category consists of work-related actions that the defendants took in their capacity as LeRette's supervisors.

### 1. Negative comments and rude behavior

LeRette says that Kiel, Pope, and Champaigne made negative comments while she was pregnant and after she returned from maternity leave, specifically:

- Kiel told LeRette that she should wear a "matron skirt" and answer desk calls while pregnant. Dkt. 45, ¶ 12.

- Champaigne told LeRette that he did not think a pregnant officer should be working in narcotics. *Id.* ¶ 7.

- LeRette told Pope that she was experiencing urgency to use the restroom post-childbirth. Pope said in a "demeaning" tone, "oh, that hasn't come back yet?" Dkt. 31 (LeRette Dep. 74:7–13).

- Pope offered to carry a chair for LeRette, so she didn't violate her medical restrictions against lifting. LeRette found Pope's tone "insincere," as though Pope thought LeRette was lying about her medical restrictions. *Id.* 73:13–74:1.

- Pope told LeRette that she hadn't had the luxury of pumping breast milk when she had her own child because she had been too busy working. Dkt. 45, ¶ 43.

LeRette also says that the defendants spoke to her in a rude and sarcastic manner, failed to invite her to events, and deliberately ignored her.

LeRette's evidence of negative comments and rude treatment does not support equal protection claims against any of the defendants. Like its corollary under Title VII, an equal protection claim based on a hostile work environment is actionable only if the plaintiff is

subjected to harassment that is so severe or pervasive as to create an abusive working environment. *Williams v. Seniff*, 342 F.3d 774, 791 (7th Cir. 2003). The Seventh Circuit has repeatedly held that conduct far more offensive than what LeRette alleges here was not severe or pervasive. *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 841 (7th Cir. 2009) (conduct was not severe or pervasive even though supervisor told the plaintiff that she was "made for the back seat of a car;" that she looked like a "dyke;" and that he hated "pushy, aggressive women" like her); *Patt v. Fam. Health Sys., Inc.*, 280 F.3d 749 (7th Cir. 2002) (same even though supervisor made eight gender-related comments, including that "the only valuable thing to a woman is that she has breasts and a vagina").

LeRette also argues that the defendants' offensive comments are evidence that their later work-related actions were discriminatory. But "[a]n isolated comment or 'stray remark' is typically insufficient to create an inference of discrimination . . . [unless] it (1) was made by the decision-maker, (2) around the time of the decision, and (3) referred to the challenged employment action." *Mach v. Will Cnty. Sheriff*, 580 F.3d 495, 499 (7th Cir. 2009). In this case, most of defendants' purportedly offensive comments were made months or even years before the other actions that LeRette challenges, and none of them referred to those actions. The comments are not helpful evidence of whether any of the work-related actions were discriminatory.

With that preface, the court turns to the work-related actions.

### 2.  Work-related actions

LeRette contends that defendants took actions in their role as her supervisors that were intended to discriminate against her based on her sex, pregnancy, and maternity status. LeRette identifies the following actions:

- Pope assigned LeRette to the property room for her light-duty assignment after maternity leave.

- Pope imposed restrictions on LeRette while she was on light duty, which prohibited her from carrying a firearm, driving a city vehicle, or leaving the station during work hours.

- Pope and Champaigne reprimanded LeRette for poor performance in her narcotics assignment.

- Pope, Champaigne, and Harriman gave LeRette contradictory instructions about reporting her time and then falsely accused her of wrongdoing related to her time reporting.

Defendants say that these actions were ordinary workplace supervision, not harassment based on LeRette's sex, pregnancy, or maternity status. The court agrees. No reasonable jury could find that these actions were harassment or that defendants took these actions with intent to discriminate against LeRette on the basis of a protected status.

### a. Property room assignment

LeRette contends that Pope discriminated against her by assigning her to work in the property room when she returned from maternity leave on light duty. LeRette points out that property room assignments were commonly viewed as a punishment among police officers. But assigning an employee a task that is within the employee's job description is not harassment, even if the assignment is undesirable. *Hobbs v. City of Chicago*, 573 F.3d 454, 464 (7th Cir. 2009); *Hambrick v. Kijakazi*, 79 F.4th 835, 843 (7th Cir. 2023). It is undisputed that property room assignments were routine for both male and female officers on light duty. Dkt. 52, ¶ 129. For example, officer Seth Noll was assigned to the property room for approximately three months in 2022 while on light duty for an injury, and officer Kelsey Davis was assigned to the property room for four months in 2022 and 2023 while on long-term light duty. *Id.* It was not

13

harassment for Pope to give LeRette a task that was within the norm for an officer on light duty.

### b. Light-duty restrictions

When LeRette was on light duty, Pope prohibited her from carrying a firearm, driving a city vehicle, or leaving the station during work hours. Defendants say that these restrictions were the department's standard practice at the time. LeRette argues that a reasonable jury could disbelieve that explanation and find that the restrictions were intentional discrimination, for three reasons.

First, LeRette points out that some officers on light duty were not restricted from carrying guns or driving a city vehicle. Evidence that other employees were treated differently can give rise to an inference of intentional discrimination, but only if the comparator employees are similarly situated to the plaintiff. *Weber v. Univ. Research Ass'n, Inc.*, 621 F.3d 589, 594 (7th Cir. 2010). Similarly situated employees do not need to be "identical in every conceivable way," but they must be the same in all material respects; in other words, the plaintiff must show that the other employees "dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* LeRette does not explain whether any of the comparators she identifies were also supervised by Pope or whether their light-duty assignments were the same as hers, so no reasonable jury could find intentional discrimination from the comparator evidence.

Second, LeRette says that city policy did not require any restrictions for light-duty officers. That's undisputedly true: the city's policy manual for light-duty assignments stated that the chief of police and his authorized designees "may" restrict employees on light duty

14

from wearing uniforms, carrying firearms, or otherwise employing their peace officer powers, but that they did not have to do so. *See* Dkt. 46-13, at 9. But LeRette doesn't explain why the city policy could support a reasonable inference of discrimination, nor does the court see how it could. The policy is not inconsistent with defendants' explanation that light duty restrictions were standard practice in the police department at the time.

Third, LeRette says that Pope attempted to cover up her discrimination by lying about the restrictions that she imposed on LeRette. In September 2024, an employee from the city's HR department emailed Kiel and Harriman, asking: "When ML [Mikayla LeRette] was on light duty before, when she was pregnant and still working in Superior, was she restricted from carrying a gun or driving her unmarked vehicle?" Dkt. 46-13, at 2. Kiel looped in Pope, who responded: "ML did not have any restrictions and never brought in light duty paperwork the first time. We were advised that we could not bring anything up to her and it was up to her and her doctor to decide when/if light duty was appropriate for her." *Id.* at 1. LeRette says that Pope lied about LeRette's restrictions in this email to cover up her discriminatory intent. Dkt. 47, at 39. But no reasonable jury could infer that, because Pope undisputedly did not lie in the September 2024 email. Pope said in the email that LeRette was not restricted from carrying a firearm or driving a city vehicle when she was pregnant. That's true: Pope did not impose restrictions on LeRette when she was pregnant. She imposed the restrictions when LeRette returned to work *after* having her baby.

In sum, none of LeRette's arguments support a reasonable inference of intentional discrimination related to the light-duty restrictions.

### c.   Reprimand for poor performance

In September 2023, Pope and Champaigne told LeRette and her partner that they were not performing well as narcotics investigators because they were not doing enough controlled buys or garbage pulls. *See* Dkt. 46-9 (Champaigne's incident report of performance meeting). LeRette characterizes this as an unjustified and discriminatory reprimand intended to "wallpaper" her personnel file. Dkt. 47, at 45.

Generally, evidence that a supervisor criticized an employee's job performance does not give rise to an actionable discrimination claim, even if the criticism was unfair. *See, e.g., Hambrick*, 79 F.4th at 843 ("[H]aving supervisors who are short tempered, hostile, unfairly critical, and disrespectful, does not amount to objectively offensive, severe, or pervasive conduct." (internal quotations omitted)). That alone is enough to doom any claim based on Champaigne and Pope's criticism of LeRette's job performance. And in any event, LeRette has not adduced evidence that the criticism of her job performance was unfair. LeRette says that Pope had previously told her that she was spending too much money on controlled buys, so Pope was contradicting herself by saying in September 2023 that LeRette needed to do more controlled buys. Dkt. 45, ¶ 52. But LeRette doesn't say when Pope told her that she was spending too much money on controlled buys. No reasonable jury could find that Pope's statements about LeRette's performance were contradictory without knowing whether they were made around the same time.

### d.   Time reporting issues

Finally, LeRette contends that Pope, Champaigne, and Harriman engaged in what she calls "scheduling discrimination," which encompasses a range of conduct related to her time reporting. Specifically, LeRette says that defendants required her to report schedule changes in

16

advance when that was not required of others, gave her conflicting instructions about reporting her time, installed a GPS tracker in her police vehicle to determine when she she arrived at and left work, initiated an internal investigation into whether she was falsely reporting her time, and formally reprimanded her with a written warning.

LeRette does not dispute that she made some errors in her time reporting. But she contends that a reasonable jury could find that defendants' response to those errors was discriminatory, because other police officers who made the same errors were not subjected to the same level of scrutiny. As the court explained above, evidence that other employees were treated differently than the plaintiff can give rise to an inference of intentional discrimination, but only if the comparator employees were similarly situated, meaning that they "dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Weber*, 621 F.3d at 594.

LeRette has failed to adduce evidence that she was treated differently than similarly situated employees. LeRette points out that Champaigne and Pope reprimanded her for failing to enter time off in the scheduling system, even though Champaigne and Pope also failed to enter their time off on certain dates. But Champaigne and Pope were not similarly situated to LeRette; they were her supervisors. Evidence they made the same errors in reporting their time may show that they acted hypocritically, but it does not show intentional discrimination.

LeRette also says that Champaigne, Pope, and Harriman investigated and reprimanded her for after-the-fact time entries that she made before her second maternity leave, but that they did not investigate or reprimand other employees who also made after-the-fact time entries. There are two problems with this argument. First, LeRette does not establish that any

17

of the other employees who made after-the-fact time entries had the same supervisors or the same time reporting expectations as LeRette. Second, LeRette characterizes her time entries as "after-the-fact entries," but that's not an accurate characterization. When LeRette went on her second maternity leave in May 2024, she failed to enter any time off at all for three days when she did not work, and she corrected those entries only after Harriman sent her a text message raising the issue. Dkt. 38-3. Completely failing to report time off is not the same thing as reporting time off after-the-fact. LeRette has no evidence that other employees engaged in the same conduct that she did and were treated differently.

The bottom line is that "everyday work disagreements," "routine workplace discipline," and "administrative annoyances" do not give rise to actionable discrimination claims. *Hambrick*, 79 F.4th at 843. Reasonable people could disagree as to whether defendants were too harsh in their supervision of LeRette. But for an equal protection claim, the question is not whether defendants acted correctly, but whether they acted with intent to discriminate on the basis of LeRette's protected statuses. *Bohen*, 799 F.2d at 1186–87. There is no evidence from which a reasonable jury could find that any of the defendants intentionally discriminated against LeRette, so the court will grant summary judgment to defendants on LeRette's equal protection claims.

### A.  FLSA claim

LeRette's FLSA claim is based on defendants' alleged failure to provide her with an appropriate place to pump breast milk during the workday. The FLSA requires employers to provide (1) reasonable break time for an employee to pump breast milk for one year after a child's birth; and (2) "a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public, which may be used by an employee to express breast

18

milk." 29 U.S.C. § 218d(a).  In 2022, the FLSA's lactation provisions were modified by the

Providing Urgent Maternal Protections for Nursing Mothers Act (PUMP) Act, which:

- added a precondition to suit, which requires employees to notify the employer about the lack of an adequate place to pump and allow ten days to correct the problem, 29 U.S.C. § 218d(g)(1); and

- clarified that employees can seek damages for violations of the lactation rules under 29 U.S.C. § 216(b).

Defendants contend that summary judgment is warranted on the FLSA claim for two reasons: first, LeRette was offered an adequate space to pump as required by the statute; and second, LeRette failed to comply with the PUMP Act's notice requirement. The first point is dispositive, so the court need not consider the second.

LeRette argues that the shower stall in the women's locker room was not an adequate lactation space under § 218d(a), because other police officers and janitorial staff regularly interrupted her while she was pumping there. But as defendants point out, LeRette did not have to use the women's locker room to pump. It is undisputed that LeRette herself suggested that she use the women's locker room before she returned from maternity leave, and that Pope told her that she could pump wherever she felt most comfortable. But when LeRette realized that the women's locker room was not an adequate space, she complained to the police chief, and he immediately suggested that she use the dedicated lactation room on the third floor of the same building. *See* Dkt. 39-1. The third-floor lactation room was a private space located only a few minutes from LeRette's workstation. *See* Dkt. 31 (LeRette Dep. 49:1–8).

LeRette says that she did not want to use the third-floor lactation room because it was further from her workstation than the women's locker room. But the FLSA does not require employers to provide employees with the exact lactation space that they prefer. *Walls v. Abington Surgical Ctr.*, 758 F. Supp. 3d 376, 386 (E.D. Pa. 2024) (no FLSA violation when

outpatient surgical center allowed nurse to pump in a conference room, instead of converting a patient room for her exclusive use as she requested). No reasonable jury could find that the third-floor lactation room was an inadequate space under § 218d(a), so the city complied with its statutory obligations by offering that room to LeRette.

The court will grant defendants' motion for summary judgment on the FLSA claim.

## B. Fourth Amendment claims

LeRette's Fourth Amendment claims are based on Champaigne's decision to install a GPS tracking device on LeRette's police vehicle to monitor when she came to and from work, and Harriman's decision to keep the GPS device in place after he replaced Champaigne as LeRette's supervisor.[4]

Defendants contend that summary judgment is warranted on the Fourth Amendment claims for two reasons. First, LeRette did not have a reasonable expectation of privacy in her employer-owned vehicle. Second, there is no clearly established law on LaRette's side to overcome defendants' qualified immunity defense.

The Fourth Amendment applies to searches of government employees by their employers. To prevail on a Fourth Amendment claim, a government employee must establish that (1) the employer's search intruded upon the employee's reasonable expectation of privacy;

---

[4] LeRette doesn't actually identify the specific defendants for her Fourth Amendment claims, either in her complaint or her brief. But she doesn't say that anyone other than Champaigne and Harriman were personally involved in placing the GPS tracker on her vehicle. Claims under 42 U.S.C. § 1983 are generally limited to defendants with personal involvement in the alleged constitutional violation. *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017). If LeRette intended to bring Fourth Amendment claims against any of the other individual defendants, the court would grant summary judgment to defendants on those claims for lack of personal involvement.

and (2) the search was unjustified in purpose or scope. *O'Connor v. Ortega*, 480 U.S. 709, 718–19 (1987); *City of Ontario, Cal. v. Quon*, 560 U.S. 746, 761 (2010).

In addition to establishing that Champaigne and Harriman violated her constitutional rights, LeRette also has to overcome their qualified immunity defense. Generally, a defendant is entitled to qualified immunity unless the plaintiff shows that her rights were clearly established at the relevant time. The plaintiff can meet this burden by pointing to either: (1) a closely analogous, binding case that was decided in her favor; (2) a more general constitutional rule that applies "with obvious clarity" to the defendants' conduct. *Cibulka v. City of Madison*, 992 F.3d 633, 639–40 (7th Cir. 2021). The court may decide that a defendant is entitled to qualified immunity without resolving the underlying constitutional issue. *Smith v. Finkley*, 10 F.4th 725, 737 (7th Cir. 2021).

LeRette spends most of her brief on the justification element of her Fourth Amendment claims. She argues that the GPS tracker was unjustified because she worked flexible hours and was allowed to work from home, so the tracker could not have provided conclusive evidence of her work hours. But the justification element matters only if the GPS tracker was a Fourth Amendment search in the first place, meaning that it intruded on LeRette's reasonable expectation of privacy. The court concludes that LeRette has not pointed to clearly established law on the reasonable expectation of privacy element, so Champaigne and Harriman are entitled to qualified immunity on that basis.

LeRette contends that her reasonable expectation of privacy is clearly established under *United States v. Jones*, 565 U.S. 400 (2012), which held that the warrantless installation of a GPS tracker on a suspect's personal vehicle violated the Fourth Amendment. The *Jones* majority did not rely on the reasonable expectation of privacy test in concluding that the GPS tracker

21

violated the Fourth Amendment. Instead, the court reasoned that the officers physically trespassed on the suspect's vehicle when they installed the tracker, because they had to physically touch the suspect's car in order to do so. *Id.* at 408–10.

Although the *Jones* majority did not rely on the reasonable expectation of privacy test, four justices wrote in a concurring opinion that they would have ruled for Jones under that test. *Id.* at 419–31 (Alito, J., concurring). As Justice Alito explained:

> Under [the reasonable expectation of privacy] approach, relatively short-term monitoring of a person's movements on public streets accords with expectations of privacy that our society has recognized as reasonable. But the use of longer-term GPS monitoring in investigations of most offenses impinges on expectations of privacy. For such offenses, society's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual's car for a very long period.

*Id.* at 430. And a few years after *Jones*, a majority of the Supreme Court adopted the concurring opinion's reasoning in *Carpenter v. United States*, 585 U.S. 296, 311 (2018). Citing the *Jones* concurrence, the court held in *Carpenter* that individuals have a reasonable expectation of privacy in their cellphone location data, because that data captures a nearly "all-encompassing record of the holder's whereabouts" and provides an "intimate window into a person's life." *Carpenter v. United States*, 585 U.S. 296, 311 (2018). Under *Jones* and *Carpenter*, the court has no trouble concluding that the warrantless installation of a GPS tracker on a personal vehicle would violate clearly established law.

But *Jones* and *Carpenter* aren't enough for LeRette to defeat qualified immunity, because this case involves an employer-owned work vehicle, not a personal vehicle. The Seventh Circuit has cautioned district courts "not to define clearly established law at too high a level of generality," and it is far from clear whether the reasoning of *Jones* and *Carpenter* would extend

22

to employer-owned vehicles. The reasoning of the *Jones* majority would be inapplicable, because there is no physical trespass when an employer places a GPS tracker on a vehicle that it owns. Nor does surveilling an employer-owned vehicle implicate the same privacy concerns that animated the *Jones* concurrence and the majority opinion in *Carpenter*. At most, GPS surveillance of an employer-owned vehicle reveals when an employee travels to and from work and where the employee goes during work hours. It does not provide an "all-encompassing record" of the employee's whereabouts in the same way that surveillance of a personal vehicle or a cellphone does.

LeRette has not pointed to a closely analogous case decided in her favor, nor has she identified a general rule that obviously bars Champaigne and Harriman's conduct. The court will grant defendants' motion for summary judgment on the Fourth Amendment claims on qualified immunity grounds.

## ORDER

IT IS ORDERED that:

1. Plaintiff Mikayla LeRette's motion to supplement the record, Dkt. 48, is GRANTED as unopposed.

2. Defendants' motion for summary judgment, Dkt. 32, is GRANTED.

3. The clerk of court is directed to enter judgment for defendants and close this case.

Entered July 27, 2026.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge